**UNITED STATES of America,**
Plaintiff-Appellee,

v.

**ERIE BASIN METAL PRODUCTS, Inc.,**
Defendant-Appellant.

No. 11910.

United States Court of Appeals
Seventh Circuit.

May 1, 1957.

Rehearing Denied July 1, 1957.

James J. Lawrence, A. Charles Lawrence, Max F. Goldberg, Chicago, Ill. (Howard Kamin, Chicago, Ill., of counsel), for appellant.

Robert Tieken, U. S. Atty., Chicago, Ill., Julian R. Wilheim, Atty., Dept. of Justice, Washington, D. C., George Cochran Doub, Asst. Atty. Gen., Paul A. Sweeney, Atty., Dept. of Justice, Washington, D. C. (Richard C. Bleloch, John

Peter Lulinski, Asst. U. S. Attys., Chicago, Ill., of counsel), for appellee.

Before DUFFY, Chief Judge, and MAJOR and LINDLEY, Circuit Judges.

MAJOR, Circuit Judge.

This action was commenced May 1, 1953, by the United States, pursuant to the Renegotiation Act of 1943, as amended (50 U.S.C.A.Appendix, § 1191), to recover excessive profits in the amount of $1,270,000, allegedly realized by the defendant under its contracts and subcontracts subject to renegotiation during its fiscal year ending November 30, 1943. The excessive profits were determined by the Chairman of the War Contracts Price Adjustment Board on January 4, 1946, and a Unilateral Determination and Order entered, a copy of which was mailed to the defendant. The government during the course of the proceeding conceded that defendant was entitled under Sec. 3806 of the 1939 Internal Revenue Code (26 U.S.C.A. § 3806) to a tax credit against the renegotiated liability, in the amount of $884,125.52, and other small credits, leaving a net balance owing by defendant on its renegotiated liability in the amount of $385,-874.48. On July 29, 1946, defendant, pursuant to authority contained in the Renegotiation Act of 1943, as amended, filed its petition in the Tax Court of the United States for a redetermination *de novo* of its alleged excessive profits for the year in question, which proceeding is still pending in that court.

Previous to the entry of the aforesaid Unilateral Determination and Order and on about December 18, 1945, defendant submitted to plaintiff a Contract Termination Claim in the form of a settlement proposal in connection with one of its terminated war contracts, in accordance with the provisions of the Contract Settlement Act of 1944 and regulations thereunder (Title 41 U.S.C.A. § 101 et seq.) (subsequently referred to as the Settlement Act). This Termination Claim No. W 11–021–CWS–569 (referred to as contract No. 569) pertained to a contract entered into with plaintiff through the Chemical War Service of the War Department which had been terminated by the government on August 15, 1945. The proposed claim as amended was in the amount of $1,157,968.91.

The sole issue in the District Court, as here, arises from defendant's affirmative defense that the alleged balance of its renegotiated liability had been satisfied, liquidated and paid in full under circumstances subsequently to be discussed. The District Court found:

"The defendant has not met the burden of proof of its affirmative defense of payment to the plaintiff of the net principal amount of excessive profits of $385,317.76 or any part thereof that it owes to the plaintiff and that it therefore owes the same and has owed it since November 30, 1943."

Thereupon, on September 14, 1956, the court entered judgment in favor of plaintiff in the amount thus found due and owing, together with interest at the rate of 2½% per annum, from May 23, 1946. From this judgment defendant appeals.

This case has previously been before this court. United States v. Erie Basin Metal Products, Inc., 231 F.2d 294. On that appeal there was a question as to whether the defense of payment could properly be invoked in a suit of the instant character and, if so, whether the District Court had rendered a decision on that issue. We held that the defense could be raised but that the court had not decided the issue, and for that reason reversed the judgment. In so doing we stated (at page 297):

"The judgment is reversed and the cause remanded, with directions that the judgment be vacated, without prejudice to the right of the District Court to decide the affirmative defense of payment or to continue the case pending a decision by the Court of Claims."

Upon remand, another trial was had, the court decided the issue of payment adverse to defendant and, as already noted, entered the judgment here in controversy. It perhaps is pertinent at this point to note that defendant on August 13, 1951 (almost two years prior to the commencement of the instant action) instituted an action in the Court of Claims against the government to recover, among other things, the balance alleged to be due on account of its Termination Claim under contract No. 569. We need not repeat that which we stated in our previous opinion regarding this suit (page 296). That action, however, so we are advised, is still pending. Thus, we have three cases pending in three separate courts between the same parties and growing out of the same general subject matter. In this court defendant is not permitted to attack the unilateral determination of its renegotiated liability but is limited to its defense of payment. We need not be concerned with the effect, if any, which our decision on the issue thus presented will have upon the cases pending either in the Tax Court or in the Court of Claims. We would not mention the matter except that the District Court, evidently sensing the incongruity of the situation, in its conclusions of law stated that the instant judgment "is not to be given or to have the effect, by way of the principle of *res adjudicata* or otherwise, to restrict or limit the assertion, prosecution and enforcement of the termination claims of Erie Basin which are set forth in the pleadings in said proceedings in the Court of Claims." In our view, neither the District Court nor this court can properly place such a limitation upon the Court of Claims. The effect which that court accords to our decision is for it to decide. We digress further to state that we agree with the observation of the District Court in United States v. Clark, 72 F.Supp. 393, 394, that this multiplicity of suits is a "travesty of the judicial process." It is not for the courts, however, to re-

solve the incongruity which the situation presents.

As already noted, while this action to recover excess profits was instituted pursuant to the Renegotiation Act of 1943, defendant's settlement proposal of its Termination Claim was made under the Settlement Act which became effective July 21, 1944. Thus, the issue of payment involves in the main the provisions of the latter Act. Also as previously noted, defendant's proposed claim as finally amended was in the amount of $1,157,968.91. No question is raised but that this claim was made in accordance with the Settlement Act and that it was submitted and considered by the authorized government officials.

Section 6(c) of the Settlement Act provides:

"*Any contracting agency may settle all or any part of any termination claim* under any war contract by agreement with the war contractor, or by determination of the amount due on the claim or part thereof without such agreement, or by any combination of these methods. *Where any such settlement is made by agreement, the settlement shall be final and conclusive,* except (1) to the extent otherwise agreed in the settlement; (2) for fraud; (3) upon renegotiation to eliminate excessive profits under section 1191 of Appendix to Title 50, unless exempt or exempted under such section; or (4) by mutual agreement before or after payment. Where any such settlement is made by determination without agreement, it shall likewise *be final and conclusive,* subject to the same exceptions as if made by agreement, unless the war contractor appeals or brings suit in accordance with section 113 of this title: *Provided, That no settlement agreement hereunder involving payment to a war contractor of an amount in excess of $50,000* (or such lesser amount as the Director may from time to time determine) *shall become binding upon the Govern-*

*ment until the agreement has been reviewed and approved by a settlement review board of three or more members established by the contracting agency* in the bureau, division, regional or district office, or other unit of the contracting agency authorized to make such settlement, or in the event of disapproval by the settlement review board, unless approved by the head of such bureau, division, regional or district office, or other unit. *Failure of the settlement review board to act upon any settlement within thirty days after its submission to the board shall operate as approval by the board. The sole function of settlement review boards shall be to determine the over-all reasonableness of proposed settlement agreements from the point of view of protecting the interests of the Government * * *.*" (Emphasis supplied.)

Defendant contends that on June 27, 1946, following negotiations between the parties, the contracting agency's local representative,. the Chicago Contract Settlement Board of the Chemical Warfare Service, approved a final and complete settlement and found a balance due defendant on the claim in the amount of $1,084,156.46. The government contends to the contrary. There appears in the record a copy of the "Minutes of Contract Settlement Board Meeting," which recites that three named members of the Contract Settlement Board met on June 27, 1946, to consider a proposed settlement of contract No. 569. The minutes, signed by the Secretary of the Board, state:

"2. *Board approved the settlement proposed by the negotiator in a net amount of $1,084,156.46 after credits and partial payments.* The approval was subject to possible modifications for additional interest and for credits in the event the Independence plant facility should be sold and the contractor receive the proceeds.

"3. Items particuarly considered by the Board in their discussions on this problem were the correctness of treating expenditures at Independence as being expenses rather than capital improvements, post-termination expenses and items of other costs. *After careful consideration of those items with the negotiator, the Board felt that the items were reasonable and approved the negotiator's proposed settlement.*" (Emphasis supplied.)

The record also contains an exhibit relative to the same claim, bearing date of June 27, 1946, which according to its heading appears to be a communication from "Contract Settlement Review Board" to "Commanding Officer, Chicago C.W.P.D." It reads as follows:

"1. The undersigned members of the Contract Settlement Review Board have met with the negotiator and reviewed with him the proposed settlement of subject contract and make the following recommendations:

"(a) That a settlement in the amount of $1,084,156.46 is approved and recommended to you as being fair and to the best interests of the government subject to possible increases for interest and decreases arising out of any approval sale of the Independence plant.

"(b) That the plant at Independence be treated as a special facility and that the government either acquire title or supervise the sale. Such treatment as a special facility would classify expenditures made at Independence as expense items rather than capital items.

"(c) That this file be held open and no final supplement agreement executed until such time as directions are received as to the procedure to be followed with respect to the handling of the Independence facility.

"2. It is the undersigned Board members' opinion that the proposed settlement is fair and equitable to both the contractor and the government and is to the best interests of the government."

Section 403(c) of the Renegotiation Act of 1943 (50 U.S.C.A.Appendix, § 1191 (c) ) provides in part as follows:

"Upon the making of an agreement, or the entry of an order, under paragraph (1) (of this subsection) by the Board, or the entry of an order under subsection (e) by The Tax Court of the United States, determining excessive profits, the Board shall *forthwith authorize and direct the Secretaries or any of them to eliminate such excessive profits* (A) by reductions in the amounts otherwise payable to the contractor under contracts with the Departments, or by other revision of their terms; or (B) *by withholding from amounts otherwise due to the contractor any amount of such excessive profits * * *.*" (Emphasis supplied.)

The Secretary of War, pursuant to authority conferred by the Renegotiation Act, on April 2, 1946 issued Memorandum No. 35–46, outlining procedures to be followed by all War Department agencies with respect to collection and accounting of excessive profits by means of withholding and otherwise. We shall refer only to a few salient provisions of this document. Supervision of the collection and accounting of excessive profits was delegated to the office of the Chief of Finance of the War Department who was *given direct responsibility* for the collection of unilateral determinations. In such situations the Chief of Finance was directed to require contracting agencies of the War Department to report funds owing to such renegotiated contractors which might be available for set-off and to direct such agencies to withhold such funds for the purpose of effecting a set-off. Where excessive profits were recouped by means of such

set-off, the contracting agency was required to prepare a statement voucher in a prescribed form in the amount of the renegotiation indebtedness. Such voucher had the effect of reducing *pro tanto* the obligation of the agency to the contractor. The contracting agency was then required to enter such voucher on its fiscal accounting records as a reduction of the obligation of appropriated funds chargeable to the contract through which such set-off was effected; also, such payments were to be included in a report under the heading "Recoupment of Excessive Profits in Statutory Renegotiation." Where the account had been referred to the office of the Chief of Finance for collection, that office was required to establish accounts receivable and record the liquidation of the account.

On May 2, 1946, a copy of the Unilateral Determination and Order against defendant was transmitted by the War Department to the Chief of Chemical Warfare Service, the contracting agency, in a communication which stated:

"It is requested that your office ascertain whether the contractor now holds any contract with your service and, if so, what amounts are now owing or will be owing under such contracts. * * *

"It is further requested that your office investigate the possibility of withholding on any termination claims the subject company might have against the Government or prime or subcontractor."

The Chief of Finance, by letter on July 10, 1946, requested of the Undersecretary of War authority to liquidate defendant's Termination Claim to the extent of the balance due on its renegotiated liability. In this letter, the Chief of Finance recommended:

"That this office be authorized to direct the Chief, Chemical Warfare Service to process a voucher in the amount of $384,873.74 crediting same to Miscellaneous Receipts, 'Reimbursement, Excess Profits on Re-

negotiated Contracts,' thereby closing the 1943 file."

This request and recommendation was approved by the War Department on July 11, 1946, with directions that no further withdrawals from the balance due on defendant's Termination Claim be permitted without specific clearance from the War Department.

On July 15, 1946, the Chief of Finance requested the Chemical Warfare Service, which had administered and allegedly settled contract No. 569, to prepare a voucher in favor of defendant in the amount of $384,873.74. In the same communication it was stated that the Undersecretary of War had requested that no withdrawals from the balance due defendant on its Termination Claim be made without specific clearance from that office. There followed an exchange of communications among the Chief of Finance, the Chemical Warfare Service and its Chicago Procurement District for the purpose of reviewing the status of defendant's contract settlements and the mechanics of the withholding procedure. In a communication of July 15, 1946, the Chief of Finance advised the Chief, Chemical Warfare Service:

"Request the Chicago Procurement District be directed to prepare a voucher in favor of said contractor in the amount of $384,873.74 and transmit same to the Finance Officer, U. S. Army, Chicago, Illinois, to be processed in his accounts leaving in the appropriation from which otherwise payable the total amount of the voucher. It is further requested this office be furnished, for accounting purposes, a copy of the voucher when processed."

On September 17, 1946, the Chicago Procurement Office in a communication to the Chemical Warfare Service further explained defendant's accounts and requested instructions as to the accounting procedure to be followed upon issuance of a voucher to defendant. On September 20, 1946, the requested information was furnished by the Chemical Warfare Service, with the statement:

"The voucher, when prepared, should indicate the date of termination of contract and the amount of the voucher should be reported as a deobligation of funds in your monthly fiscal report. The voucher should also indicate that the amount is being applied to liquidate the indebtedness of the contractor due to renegotiation on excessive profits for the Fiscal Year ended 30 November 1943."

Finally, on October 14, 1946, a public voucher in favor of defendant, in the amount of $384,873.74, was drawn by the contracting officer in Chicago. It was endorsed by defendant and transmitted to the Finance Officer of the United States Army in Chicago. This officer stamped the voucher "Paid" and entered it in his fiscal accounting records as a "deobligation" of appropriated funds, i. e., as a reduction of the obligation of appropriated funds chargeable to contract No. 569. A copy of the voucher was transmitted to the office of the Chief of Finance in Washington, in compliance with the request of that office made in its communication of July 15, 1946 to the Chemical Warfare Service.

On May 5, 1947, the Chief of Finance of the War Department wrote defendant as follows:

"Your indebtedness, following renegotiation proceedings as determined by the Chairman, War Department Price Adjustment Board and the War Contracts Price Adjustment Board, for fiscal year ended 30 November 1943, has been liquidated by withholdings."

Thus, it will be observed that the "no payment" voucher issued to defendant on October 14, 1946, in the amount of $384,873.74, was the balance due on its renegotiated liability. Obviously, the voucher, if properly issued, when re-

turned to the government entitled defendant to a set-off against the balance due on such liability.

Plaintiff's argument in support of the judgment has many facets. A brief of 112 pages has been submitted, with comparatively little attention given to the Settlement Act but much reliance placed upon regulations promulgated both prior and subsequent to its enactment. The principal contention appears to be that there was never any final, binding settlement of defendant's Termination Claim under contract No. 569. This argument rests in the main on the premise that the agreement did not become final in the absence of a written supplemental agreement.

It will be noted that Sec. 6(c) of the Settlement Act (heretofore set forth) makes no such requirement. It is argued, however, that the section should be construed as containing such requirement. In support of this argument the government relies heavily upon the practice and procedure followed by different departments prior to the enactment of the Settlement Act, as well as numerous regulations previously in effect. The practice as well as the regulations required that settlement agreements with the government be reduced to writing. The government points out that Congress when it enacted the Settlement Act had knowledge of this previous practice and it is reasonable to conclude, therefore, that it was the intent and purpose to continue the requirement under the Settlement Act. We think the argument is a *non sequitur*. If Congress had intended to require a written agreement, it would have so provided. It is more reasonable to think that with knowledge of the prior requirement its omission in the Settlement Act was intentional and deliberate.

■ In this connection it is pertinent but would unduly prolong this opinion to enter into discussion of the legislative history of the Act. It is sufficient to state that it plainly shows that the prime purpose of Congress was to eliminate all red tape and to provide a means for the expeditious settlement of war contracts which had been abruptly terminated at the conclusion of the war. Speed and finality were the essentials of the program. See Condenser Service & Engineering Co., Inc. v. United States, 128 F.Supp. 148, 150, 130 Ct.Cl. 714.

Section 6(c) epitomizes the congressional purpose and emphasizes the goal of finality. The congressional purpose of finality is also emphasized by Sec. 103(m) of the Settlement Act as follows:

"The term 'final and conclusive', as applied to any settlement, finding, or decision, means that such settlement, finding, or decision shall not be reopened, annulled, modified, set aside, or disregarded by any officer, employee, or agent of the United States * * *."

The government also argues that what purport to be the records of a meeting of the Contract Settlement Board and a meeting of the Contract Settlement Review Board (heretofore set forth) refer only to a meeting of the former Board. Assuming without admitting that such is the case, it does not militate against the finality of the settlement agreement. It is true that Sec. 6(c) provides that an agreement to pay a war contractor in excess of $50,000 shall not become binding upon the government until the agreement has been reviewed and approved by the Settlement Review Board. However, the section also provides that "failure of the settlement review board to act upon any settlement within thirty days after its submission to the board shall operate as approval by the board." The agreement reached between the Contract Settlement Board and the contractor was submitted to the Review Board. Whether the document under discussion shows an approval by the Review Board, as urged by defendant, or whether it shows a failure to act by the Review Board, as contended by the government, is thus immaterial.

In either event, the agreement reached was final and conclusive.

The government argues that what defendant relies upon as proof of a final and conclusive settlement of its claim was nothing more than a "proposed settlement" because the settlement approval included a condition relative to a plant operated by defendant at Independence, Kansas. This plant was afterward sold for the sum of $91,000, which was placed in escrow in accordance with an agreement of sale made with the approval of the Secretary of War. We need not be concerned with that matter because we think it is beside the issue. No contention is made that defendant is or will be entitled to the $91,000. In our judgment, this contention or suggestion made either by the Settlement Board or the Settlement Review Board does not detract from the finality of the amount approved in settlement. The situation insofar as it relates to finality is much akin to the situation presented on the previous appeal. In that case the court entered judgment for the principal amount of defendant's renegotiated liability, but made its decision on the government's claim for interest dependent on the outcome of the suit pending in the Court of Claims. The government here contended and this court agreed that the condition regarding interest did not impair the finality of the judgment. Another point to be noted is that the Settlement Review Board was without authority to attach any conditions to its approval. Its sole authority was limited to either approval or disapproval. Section 6(c) provides, "The sole function of settlement review boards shall be to determine the over-all reasonableness of proposed settlement agreements from the point of view of protecting the interests of the Government."

On the previous appeal this court stated (231 F.2d at page 295):

"The government contended that action taken by certain of its officials with reference to this claim was a mistake or without authority and, therefore, not binding on the government."

We still think that was the position of the government then, and apparently the same position was taken in the District Court in the instant proceeding. There, counsel for the government, referring to the no payment voucher, stated, "So this voucher in its essence can be regarded as nothing but a mistake, an inadvertent mistake * * *." On this appeal the government appears to have shifted its position. It states in its brief, "Plaintiff's position in this action is that defendant failed to prove its affirmative defense of payment and not merely that a mistake of payment has occurred, which avoids such defense." It is not strange that the government attempts to repudiate or at least modify its mistake or lack of authority theory. Every official who had anything to do with the processing of defendant's Termination Claim and the issuance of the voucher in question had the authority and intended to do precisely what was done. There was no mistake or lack of authority.

The treatment which was accorded defendant's Termination Claim by authorized government officials is not only of great significance but comes close to emasculating every argument which the government advances in support of its premise that there was not a final settlement with defendant which culminated in the issuance of the voucher in question. The settlement agreement was recognized as final by the Chemical Warfare Service, the contracting agency, and by the Chief of Finance who obtained specific authority from the War Department to settle the claim as proposed and to issue a voucher in the amount then owing by defendant on its renegotiation liability. They all treated the agreement made by the Settlement Board as final and binding upon the government. They found none of the defects which the government now professes to discern as impairing the validity of the settlement. To think that they were not familiar

with the law and regulations controlling in the matter would be to cast a serious reflection either upon their competency or integrity, or both. This, we think, should not be done. More than that, for some reason not explained by the record, this action was not commenced until seven years after the accrual of the alleged liability.

We have postponed to the last a consideration of the government's argument which follows a headnote in its brief, as follows: "The War Department Properly and Effectively 'Froze,' or Suspended, Termination Settlement Negotiations With Defendant Under Contract 569, Prior to Entering Into Any Final, Binding Settlement Agreement With Defendant."

On July 16, 1946, there was issued by the Secretary of War an order which provided in part as follows:

"There is listed below a compilation of companies affiliated with Erie Basin Metal Products Company, which companies are under suspicion of fraudulent activities. * * * [Companies listed, including defendant.]

"In the event that suspension of negotiations for the settlement of all terminated contracts pertaining to the foregoing companies, where applicable, has not been made, it is directed that such action be taken immediately and that no further steps be made toward the settlement or payment of funds due under any price or subcontracts held by these companies until further notice from this office."

It will be noted that fraud was not alleged, but only a "suspicion of fraudulent activities." Absent this order, we doubt if any question concerning the finality of the settlement would have been raised. As we shall show, however, there was no legal basis for the order and, in our judgment, it was a nullity. Section 6(c), as previously noted, makes a settlement agreement final and con-

clusive, with certain exceptions, including a settlement procured "for fraud." Section 118(e) of the Contract Settlement Act makes provision for reporting to the Department of Justice facts relative to a settlement induced by fraud. Thus, it appears clear that a settlement agreement, like a court judgment, is open to attack if procured by fraud, but fraud must be alleged and proved. See United States v. Wunderlich, 342 U.S. 98, 100, 72 S.Ct. 154, 96 L.Ed. 113. Here, there is no allegation, much less proof, of fraud, nothing more than the anemic statement of a "suspicion." There is no principle of law of which we are aware which authorizes a government agency or any other to impale a person upon a suspicion and leave him dangling in midair for ten years, without charge and without trial. Obviously, Congress did not intend, certainly it did not provide, that a contractor should or could be deprived of the rights which it had created upon a "suspicion of fraud." We need not stop to inquire what the pleadings disclose either in the Tax Court or in the Court of Claims, but, so far as the record in this case discloses, the pleadings contain no allegation of fraud; the government still rests, as it did ten years ago, upon a "suspicion." If the government desired to excuse the acts of its officers and agents on the basis that the settlement agreement and the voucher in question were procured by fraud, we know of no reason why it could not have so alleged in a pleading in response to defendant's plea of payment. An issue would have been created, with an opportunity to the defendant to meet any proof which the government might have in support of such a charge.

The government in support of the July 16 order under discussion cites Joint Termination Regulation, Par. 138.2 (Federal Register, May 9, 1945, p. 5174), which is entitled, "Duty to Report Fraud." The substance of this regulation is that where a contracting officer "has reason to believe" that fraud has been committed in connection with a ter-

mination claim of a war contractor, no further action shall be taken but that a report of all known pertinent facts shall be made. Assuming the validity of this regulation, it furnishes no justification for the "suspicion of fraud" order issued by the Secretary of War. A "suspicion" does not support a "reason to believe" that fraud has been committed.

It is our conclusion and we so hold that the parties entered into a binding and final settlement agreement relative to defendant's Termination Claim proposed under contract No. 569, and that the voucher in question was legally issued. The government was obligated to utilize the voucher as a set-off against the balance owing by defendant on its renegotiated liability. It follows that the judgment of the District Court in favor of plaintiff and against defendant is erroneous. It is, therefore, reversed and the cause remanded, with directions that the judgment be vacated and such further proceedings had as may be consistent with the views herein expressed.